# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**WILLIAM BROWN**

**VERSUS**

**PHOENIX LIFE INSURANCE COMPANY**

**CIVIL ACTION**

**NO. 18-478-JWD-EWD**

## RULING AND ORDER

This matter comes before the Court on two motions.  First before the Court is *Defendant's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)* (Doc. 13) filed by Defendant Phoenix Life Insurance Company ("Phoenix" or "Defendant"). Plaintiff William E. Brown ("Plaintiff" or "Brown") opposes the motion. (Doc. 18.) Phoenix has filed a reply. (Doc. 20.)  Oral argument is not necessary.

Second, this matter comes before the Court on *Plaintiff's Motion to Defer Prescription to Trial*. (Doc. 21.) Defendant Phoenix opposes the motion. (Doc. 23.) Plaintiff Brown has filed a reply. (Doc. 24.)

The Court has carefully considered the law, facts in the record, and arguments and submissions of the parties and is prepared to rule. For the following reasons, Defendant's motion is granted, and Plaintiff's motion is denied.

## I.      Relevant Factual Background

The following factual allegations are taken from Plaintiff's *Amended Complaint*. (Doc. 8.) They are assumed to be true for purposes of this motion. *Thompson v. City of Waco, Tex.,* 764 F.3d 500, 502–03 (5th Cir. 2014).

Phoenix and its agent sold a universal life insurance policy to Brown in December 1986. (Doc. 8 at 6.) Brown asserts that Phoenix's agent described the policy (hereafter referred to as "the

Policy" or "the written Policy") to Brown as follows: "VISTAFLEX Policy K02623586 is a type of Universal Life Insurance. Universal Life (UL) is a combination of permanent insurance and an investment fund that provides coverage for [Brown's] entire life (Letter dated February 6, 2009)." (*Id*.) Brown claims that at the time of sale, Phoenix's agent represented to Brown the following: (a) the Policy is a universal life insurance policy with a $150,000 death benefit and a $1,200 annual or $100 monthly premium for the life of the Policy; (b) the premium would be invested in an investment fund, earning interest at 9.75%; and (c) the investment fund would increase in value over time and could be used to pay premiums to provide life insurance for Brown's life or could be used to reduce premiums. (Doc. 8 at 7-8.)

At the time of sale, Brown was given an "*Application for Insurance*," as well as an "*ILLUSTRATION*." (Doc. 8 at 8.) Brown signed the *Application for Insurance*, which stated in pertinent part that the "[P]olicy and insurance applied for will take effect when the [P]olicy is delivered to the owner and the full first premium is paid in cash during the lifetime of the proposed insured(s)…" (Doc. 5-4 at 3.) According to the recital in the *Application*, in addition to Brown's signature, Brown also submitted and paid the first premium. (Doc. 8 at 6.) The *ILLUSTRATION* that was also given to Brown at the time of sale provided Brown with information pertaining to the "annual outlay," "assumed interest," and "cash value" of the Policy. (Doc. 8 at 8.) The *ILLUSTRATION*'s footnotes referenced that the interest rate and cost of insurance were subject to change and that additional premiums would be required in month 7 of year 19 or the Policy could lapse. (*Id*.) No records appear in Brown's file that would suggest that Phoenix's agent discussed or provided an explanation and/or projection for the "cost of insurance". (*Id.*)

After the sale of the Policy, Phoenix proceeded to send Brown monthly "*Premium Notices*" for over 30 years, which reflected a $100 monthly premium. (Doc. 8 at 7.) All premiums were paid

by Brown from the time of sale in December 1986 until the filing of the Petition. (Doc. 8 at 6.)

The dispute arising from Brown's Amended Complaint stem from two main issues. First, at an unspecified point in time, Phoenix began imposing extra or additional charges on Brown (also referred to as "mortality charges," "cost of insurance," and/or "additional premiums"), while also deducting extra or additional charges from the investment fund (also referred to as: "cash value" and/or "policy account value"). (Doc. 8 at 9.) Brown states that in 2018 Phoenix intended to charge $6,443 for the "mortality charges" plus a $11,321.04 premium payment to pay the "mortality charges" and fund the investment; thereby, charging "9.4 times" more than the original $1,200 premium. (Doc. 8 at 3.) Brown's files reflect that Phoenix sent Brown a "*Lost Policy Certificate*" in response to Brown's request for a copy of the Policy. (Doc. 8 at 7.) Brown claims that the *Lost Policy Certificate* did not disclose the additional "mortality charges," but only reflected a single [level] monthly premium of $100. (*Id*.) Additionally, Brown references in his Amended Complaint that the monthly *Premium Notices* only reflected a premium amount $100/month without mention of "mortality charges," "additional premiums," and/or "cost of insurance." (Doc. 8 at 7.)

The second issue arises from Brown's allegation that Phoenix failed to deliver the Policy. (Doc. 8 at 7.) Brown's records reflect that he requested that Phoenix deliver the Policy to him six times in writing (Doc. 8 at 7), and, despite this, Phoenix and its agent failed to deliver the Policy to Brown for over 31 years. (Doc. 8 at 6.) Brown's written requests are as follows:

(a) [First written request: no copy in Brown's file]
(b) [Handwritten letter, undated]: "This is my second request to company headquarters for my life insurance policy."
(c) November 23, 1988 letter: "This is my third request to Home Life[1] headquarters for my insurance policy…I have not been able to obtain the policy from the agent or the company. Please send me the policy immediately."
(d) May 17, 1995 letter: "In reviewing my life insurance policies, I realized that I

---

[1] Phoenix Life Insurance Company was previously known as "Home Life".

still have not received a copy of my Home Life policy…I am requesting a return of the premiums paid."
(e) January 12, 2009 letter: "Please send a copy of the agreement that authorizes Phoenix to increase the premiums and a copy of the premium schedule for past and future years…As your files will show, I have never received a copy of the policy. All I have is a Lost Policy Certificate."
(f) August 3, 2015 letter: "3. Enclosed is a Lost Contract Agreement and a check for $35. (As stated in previous correspondence, I never received the original insurance policy from Home Life or the agent, Andy Goodyear, New Orleans)."

(Doc. 8 at 2–3.)

In 2015, twenty-nine (29) years after the sale of the policy and payment of the first premium, Phoenix sent a "duplicate" and "representative" copy of the Policy to Brown. (Doc. 8 at 10.) In 2018, Phoenix's customer care representative told Brown that there was no delivery receipt in the Phoenix file. (*Id.*)

Brown makes several claims. First, Brown argues pursuant to La. Civ. Code art. 1986 that he is entitled to specific performance of the terms agreed upon orally with Phoenix's agent at the time of sale of the Policy in 1986. (Doc. 8 at 10.) More specifically, Brown wishes to enforce the alleged oral agreement in which Brown and Phoenix's agent agreed that Brown could maintain the Policy permanently by paying an annual premium of $1,200 without additional charges ("mortality charges" or "costs of insurance") or deductions. (*Id.*)

Second, and in the alternative, Brown claims that the "mortality charges" deducted from the investment fund constitutes a breach of contract as to the (oral) terms agreed upon which were that the Policy could be maintained by a $1,200/year premium. (Doc. 8 at 12.) Additionally, Brown asserts that Phoenix acted in "bad faith" in selling a universal life insurance policy to Brown on the basis that it was "permanent insurance" plus an investment fund, while instead imposing additional costs on the insured which ultimately lead to the lapse of the Policy. (Doc. 8 at 12.) Brown claims he is entitled to recover damages, including unforeseeable damages, caused by the

bad faith breach of contract. (Doc. 8 at 12.)

Again, Brown restates the contention that instead of receiving permanent insurance, Phoenix charged additional costs making the Policy unaffordable and thereby causing the Policy to terminate due to Brown's inability to pay the additional premiums. (Doc. 8 at 16.) Brown claims thirdly that, pursuant to La. Civ. Code arts. 1948, 1949, and 1950, the Policy should be rescinded for error and/or fraud because Phoenix's agent caused Brown to believe in error that the Policy provided permanent insurance. (Doc. 8 at 13.)[2]

Fourth, and in the alternative to Brown's specific performance and breach of contract claims, Brown asserts that Phoenix's failure to deliver the Policy in violation of La. R.S. § 22:634 and its' failure to comply with the *Application for Insurance* results in an absolute nullity. (Doc. 8 at 11.) Brown states he is entitled to restitution of all premiums paid plus interest from the date of payment compounded annually. (Doc. 8 at 11.)

## II.     Rule 12(b)(6) Standard

"Federal pleading rules call for a 'short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. R. Civ. P. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 346–47 (2014) (citation omitted).

Interpreting Rule 8(a) of the Federal Rules of Civil Procedure, the Fifth Circuit has explained:

> The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim. "Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]."

---

[2] While Plaintiff's Amended Complaint (Doc. 8) references error, the Amended Complaint is missing his argument as to fraud. (*see* Doc. 8 at 13-14.)

*Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 1965 (2007)).

Applying the above case law, the Western District of Louisiana has stated:

Therefore, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled. Once those factual allegations are identified, drawing on the court's judicial experience and common sense, the analysis is whether those facts, which need not be detailed or specific, allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009)]; *Twombly*, 55[0] U.S. at 556. This analysis is not substantively different from that set forth in *Lormand*, *supra*, nor does this jurisprudence foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of the claim. The standard, under the specific language of Fed. R. Civ. P. 8(a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based. The standard is met by the "reasonable inference" the court must make that, with or without discovery, the facts set forth a plausible claim for relief under a particular theory of law provided that there is a "reasonable expectation" that "discovery will reveal relevant evidence of each element of the claim." *Lormand*, 565 F.3d at 257; *Twombly*, 55[0] U.S. at 556.

*Diamond Servs. Corp. v. Oceanografia*, *S.A. De* C.V., No. 10-00177, 2011 WL 938785, at *3 (W.D. La. Feb. 9, 2011) (citation omitted).

In deciding a Rule 12(b)(6) motion, all well-pleaded facts are taken as true and viewed in the light most favorable to the plaintiff. *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502–03 (5th Cir. 2014). The task of the Court is not to decide if the plaintiff will eventually be successful, but to determine if a "legally cognizable claim" has been asserted." *Id.* at 503.

### III. Discussion of *Defendant's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)* (Doc. 13)

#### A. Summary of Ruling

As stated above, Plaintiff asserts four main claims: (1) specific performance, (2) breach of contract and bad faith damages, (3) rescission for error and/or fraud, and (4) a declaration that the

policy is an absolute nullity because it was not delivered. The Court will address each of these claims in turn below.

In sum, having carefully considered the law and allegations of the Complaint, the Court finds that Plaintiff has failed to state any cognizable claim. First, Plaintiff's claims for specific performance, breach of contract, and bad faith damages all fail because all insurance contracts must be in writing, so, as a matter of law, Plaintiff cannot enforce an alleged oral or partially oral agreement. Second, Plaintiff's claim for rescission for error and/or fraud fail both because these claims have prescribed. And third, Plaintiff cannot declare the insurance policy an absolute nullity because, under Louisiana jurisprudence, Courts routinely enforce undelivered policies. For all these reasons, Plaintiff has failed to state a valid claim, and the Defendant's motion to dismiss will be granted.

### B. Plaintiff's Claim for Specific Performance and the Enforceability of Oral Life Insurance Polices

#### 1. Parties' Arguments

##### a. Defendant's Argument in Support of its Motion to Dismiss (Doc. 13-1)

Defendant argues dismissal is appropriate in this case for several reasons. The Defendant maintains that the parties could not and did not create an oral life insurance policy. (Doc. 13-1 at 7.) Further, the Defendant highlights that Plaintiff does not wish to enforce the written contract of insurance that he signed with Phoenix's agent in 1986, but rather Plaintiff seeks specific performance of an oral insurance policy based on Plaintiff's alleged oral communications with Phoenix's agent in 1986. (Doc. 13-1 at 1–2.) Applying the standard set out in *Louisiana Maintenance Services, Inc. v. Certain Underwriters at Lloyd's of London*, 616 So.2d 1250, 1252 (La. 1993); La. R.S. 22:867; La. R.S. 22:864; and La. R.S. 22:931, Defendant argues that Plaintiff

cannot sustain a claim for enforcement of a purported oral insurance policy because the parties could not create an oral life insurance policy since, Defendant argues, Louisiana law mandates that insurance contracts must be in writing and can only be altered or amended in writing. (Doc. 13-1 at 7.) Moreover, Defendant states that Plaintiff knew he was applying for and receiving a Vista Flex Policy, rather than the oral agreement/policy, since Plaintiff signed the Policy *Application*. Plaintiff's signature on the *Application* acknowledged that Plaintiff was applying for a "Vista Flex" policy and that Plaintiff understood that the agent had no authority make a different contract: "It is understood and agreed as follows: 2. No agent has authority…to make or alter any contract or policy." (Doc. 5-4 at 1-3.) Defendant argues that these actions by Plaintiff confirm that Plaintiff purchased and understood he was purchasing the written, Vista Flex policy with flexible premiums, rather than an oral policy which guaranteed permanent insurance if $12,000 in annual premiums were paid. (Doc. 20 at 1.)

### b. Plaintiff's Opposition to Defendant's Motion to Dismiss (Doc. 18)

Plaintiff asserts that the initial communication between him and Phoenix's agent created a new life insurance policy or, alternatively, modified the written Policy's terms because insurance policies "must be constructed from terms agreed upon at the inception. . ." Further, in support of this argument, Plaintiff states that the *Lost Policy Certificate* provided the amount of the premium but did not mention additional costs evidencing Plaintiff's intent and understanding of the terms at the "inception." (Doc. 18 at 4.)

In an effort to support his argument that the oral terms are enforceable rather than the written terms, Plaintiff argues that since the Policy was undelivered, the terms in the written Policy are unenforceable. (Doc. 18 at 1.) Relying on the language from *Louisiana Maint. Serv.* which states that, "…under Louisiana law an insurer cannot take advantage of favorable policy terms

where it delayed delivery of the policy after the insured paid the premium," Plaintiff asserts that the Phoenix cannot enforce the terms of the undelivered written Policy to raise the cost of insurance." 616 So.2d at 1253. (Doc. 18 at 1.)

In the Reply to Defendant's argument that oral insurance policies are unenforceable in Louisiana pursuant to La. Rev. Stat. 22:867 (Doc. 13-1 at 7), Plaintiff asserts that the oral communication is considered a binding contract because the *Lost Policy Certificate, Application for Insurance*, and *Annual Reports* are part of the Policy itself making the contract "part oral, part written, part course of performance which satisfies the writing requirement imposed by La. Rev. Stat. 22:867. (Doc. 18 at 3).

### c. Defendant's Reply in Support of its Motion to Dismiss (Doc. 20)

In Defendant's reply to Plaintiff's Opposition of its Motion to Dismiss, the Defendant points out that Plaintiff cites no authority to support his argument that an "almost entirely oral life insurance policy can be enforced." (Doc. 20 at 1.) As to Plaintiff's reliance on *Louisiana Maint. Serv.*, Defendant argues that Plaintiff misinterpreted the holding of the Court which is that policy exclusions of an undelivered are unenforceable, not the whole policy itself, as Plaintiff asserts. (Doc. 20 at 2.) Further, Defendant states that Plaintiff ignores the fact that Louisiana courts routinely enforce non-delivered policies. (*Id*).

Additionally, Defendant argues that Plaintiff tacitly concedes that the Court cannot enforce oral life insurance policies when Plaintiff argues that the writing requirement was fulfilled because the *Lost Policy Certificate, Annual Reports, and Application* make the contract not purely oral but, "part oral, part written, part course of performance". (Doc. 20 at 2.)

As stated in Defendant's Memorandum in Support of its Motion (Doc. 13-1), Defendant again reiterates that Plaintiff's actions subsequent to the purchase of the Policy (signing the

*Application*) confirm that Plaintiff purchased and understood he was purchasing the written, Vista Flex policy rather than an oral policy. (Doc. 20 at 1.) Defendant notes that nothing in the *Application* states that Plaintiff would never have to pay more than $100/month simply because Plaintiff wrote "$100" in the *Application* box marked "Planned Periodic Premium". (Doc. 20 at 3.) Defendant argues that the Policy did not guarantee a set, permanent premium, but rather permitted Plaintiff to decide how much and when to pay with certain limitations, which included that enough premiums be paid to cover the monthly deductions for the cost of insurance. (Doc. 20 at 4.)

### 2. Relevant Standard

To receive specific performance or damages for breach of contract, a valid contract or obligation must exist between the parties. Louisiana Civil Code Article 1986 states "Upon an obligor's ***failure to perform an obligation*** to deliver a thing, or not to do an act, or to execute an instrument, the court shall grant specific performance. . ." (emphasis added). In addition, La. Civ. Code art. 1997 states, "An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his ***failure to perform***." (emphasis added).

Similarly, enforceable contracts require proper formation: "A contract is formed by the consent of the parties established through offer and acceptance. Thus, an enforceable contract requires a meeting of the minds. ***Unless*** the law requires a certain formality, offer and acceptance can be made orally…" *Read v. Willwoods Community*, 165 So.3d 883, 887 (La. 2015) (emphasis added).

Louisiana Revised Statute § 22:867 establishes that all insurance policies in Louisiana must be in writing in order to be valid. The statute, sometimes referred to as the "whole contract statute," states in pertinent part:

A. No agreement in conflict with, modifying, or extending the coverage of any contract of insurance ***shall be valid unless it is in writing*** and physically made a part of the policy or other written evidence of insurance, or it is incorporated in the policy or other written evidence of insurance by specific reference to another policy or written evidence of insurance. . .

La. Rev. Stat. § 22:867 (emphasis added).

The principle set out in La. Rev. Stat. § 22:867 is firmly established in Louisiana jurisprudence, as evidenced by an 1843 Louisiana Supreme Court decision citing the notion that "whatever proposals are made, or conversations held prior to the subscription of the policy, are to be considered waived, if not inserted in the policy, or in a memorandum annexed to it." *Bell v. The Western Marine & Fire Ins. Co.,* 5 Rob. 423 (La. 1843). The purpose of the statute is "to furnish both parties with the entire contract between them at the time of the contract's formation to enable them to be informed of its terms." *Jones v. Breaux*, 289 So.2d 110, 112 (La. 1974). Louisiana Revised Statute § 22:864(A) further reinforces the writing requirement contained in La. Rev. Stat. § 22:867 stating, "[t]he written instrument, in which a contract of insurance is set forth, is the policy."

### 3. Analysis

Here, Plaintiff asks the Court to impose specific performance of an alleged new, oral insurance contract (not the written Policy) or specific performance of the written Policy in which its terms are modified by the oral agreement between Plaintiff and Phoenix's agent. In short, the Court rejects this argument.

Plaintiff fails to state a claim upon which relief can be granted; while oral offer and acceptance can, as a general rule, create a binding contract, as to contracts of insurance, the "law requires a certain formality" *Read*, 165 So.3d at 887, which is mandated in La. Rev. Stat. § 22:867 (no agreements nor modifications to a contract of insurance are valid unless they are in writing

and/or physically made part of the policy). Therefore, the oral offer and acceptance between Brown and Phoenix's agent could not create a "contract of insurance," nor could it alter the terms of the written and enforceable contract of insurance.

Similarly, the remedy of specific performance requires a failure to perform an obligation. Because the obligation is not in existence, specific performance cannot be granted. *See* La. Civ. Code art. 1986.

In Plaintiff's Reply, he argues that the agreement satisfies the writing requirement, forming an enforceable contract, because it was "part oral, part written, part performance." Plaintiff further maintains that the contract should be enforced as he understood it at the "inception" of the agreement.

Plaintiff errs for several reasons. First, he fails to cite any authority in support of either of these arguments. Without some support to rebut the above law, Plaintiff cannot prevail.

Second, by arguing that the contract is enforceable because it is not purely oral, Plaintiff tacitly concedes that oral policies are unenforceable. On this additional ground, Plaintiff is not entitled to relief.

Third, Plaintiff cannot rely on miscellaneous documents outside the policy to obtain specific performance. Louisiana Revised Statute § 22:864(A) states that the "***written instrument***, in which a contract of insurance is set forth, is ***the policy***." (emphasis added). Read *in pari materia* with La. Rev. Stat. § 22:867, one can infer that a "written instrument" will satisfy the writing requirement, and that the written instrument required is the policy itself, which will contain the contract of insurance. In order to be a "contract of insurance," which is set forth in the policy, it must be a contract whereby "one undertakes to indemnify another or pay a specified amount upon determinable contingencies." La. Rev. Stat. § 22:46. Applying these standards, it is unlikely that

these miscellaneous documents are considered part of the actual "policy," which must be in writing; therefore, the writing requirement is not satisfied, and the oral agreement is not binding since it is not set forth in a written policy as required by law. *See United States Pipe & Foundry Co. v. U. S. Fid. & Guar. Co.,* 505 F.2d 88, 89 (5th Cir. 1974) (finding that a certificate of insurance issued incident to a policy did "not constitute a contract between the lessor and the insurer" that would provide coverage, rights, or benefits to the lessor).

In conclusion, a policy is the law between the parties, and a court is not ordinarily at liberty to depart from the terms of the policy. *Oil Well Supply Co. v. New York Life Ins. Co*., 38 So.2d 777, 782 (La. 1949). Under Louisiana law, an insurance policy is an agreement between the parties and is interpreted using ordinary contract principles. *See Reynolds v. Select Props., Ltd.,* 634 So. 2d 1180, 1183 (1994). Therefore, when the words of the policy are clear, unambiguously express the intent of the parties, and lead to no absurd consequences, the contract must be enforced as written. *Moore v. State Farm Mut. Auto. Ins. Co.,* 520 F. Supp. 2d 815, 824 (E.D. La. 2007). All terms discussed orally, as well as any agreements outside the written Policy, are irrelevant as to the binding contractual terms between the parties. As a result, Plaintiff's claim for specific performance must be dismissed.

### C. Plaintiff's Claim for Breach of Contract and Bad Faith

#### 1. Parties' Arguments

##### a. Defendant's Argument in Support of its Motion to Dismiss (Doc. 13-1)

Next, Defendant argues that the Plaintiff fails to allege a breach of the written policy and therefore fails to state a claim upon which relief may be granted. Citing *Volentine v. Raeford Farms of Louisiana* (ordinary and bad faith liability both require a failure to perform the contract); La. Civ. Code art. 1986 (specific performance requiring an obligor's failure to perform an obligation);

and La. Civ. Code art. 1997 (bad faith liability premised on "failure to perform"), Defendant argues that, in order for Plaintiff to prevail on any of his contract claims he must allege that Phoenix violated a provision of the written policy, which Plaintiff fails to do. (Doc. 13-1 at 8.) Therefore, in the absence of allegations of breach of the written policy, Defendant asserts that Plaintiff fails to state a claim.

### b. Plaintiff's Opposition to Defendant's Motion to Dismiss (Doc. 18)

In reply to Defendant's Memorandum in Support (Doc. 18), Plaintiff argues that the Amended Complaint does state a valid claim for breach of contract because Plaintiff did allege breach of the written policy. (Doc. 18 at 2.) Plaintiff asserts that because Phoenix's agent represented to the Plaintiff at the time of sale that the Policy was a type of insurance contract that contained a combination of "permanent insurance" and an "investment fund" that would provide insurance for his entire life, the obligation was breached by Phoenix's failure to pay interest on premiums to build an investment fund that would do so. (Doc. 18 at 2.)

### 2. Relevant Standard

Louisiana Civil Code art. 1994 states that, to have a claim for "breach" of a contract, the obligor's liability must arise from the obligor's "failure to perform a conventional obligation…" La. Civ. Code art. 1994. Therefore, the obligor must fail to perform an enforceable contract for the obligee to receive damages for the breach of performance. As to bad faith breach of contract, Article 1997 states that an "obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform." La. Civ. Code art. 1997. Both articles require a failure to perform an obligation—meaning that a binding obligation must exist in order to receive relief for failure to perform said obligation.

### 3. Analysis

From Plaintiff's Amended Complaint, it appears he grounds his contractual claims in the purported oral life insurance policy. Specifically, it appears that Plaintiff is not alleging breach of the written Policy, since the written Policy never promised that coverage would be sustained permanently upon annual premium payments of $1,200. On the other hand, the purported oral policy did promise this.

Accordingly, for the same reasons that Plaintiff cannot receive specific performance of the purported oral policy, Plaintiff cannot receive relief for breach or bad faith damages. Both of these claims require that an obligor breach a valid contract, but, as demonstrated above, there is no valid obligation here because the alleged oral agreement did not form a conventional obligation (here, a written contract of insurance). Therefore, because Plaintiff cannot receive relief for Defendant's failure to perform an obligation that does not exist, Plaintiff's breach of contract claim and claim for bad faith damages are dismissed.

### D. Plaintiff's Claim for Nullity of an Undelivered Insurance Policy

#### 1. Parties' Arguments

##### a. Defendant's Argument in Support of its Motion to Dismiss (Doc. 13-1)

Defendant disputes the allegation that the Policy was never delivered to the Plaintiff but argues that, even if the Policy was not delivered, failure to deliver an insurance policy does not result its absolute nullity. In support, Defendant cites La. Civ. Code art. 2030, which states that a contract is only "absolutely null when it violates a rule of public order, as when the object of a contract is illicit or immoral." In support of its argument that the undelivered Policy is not a contract that "violates a rule of public order" or is "illicit" or "immoral", Defendant cites to jurisprudence demonstrating that Louisiana courts enforce insurance policies even when there is

failure to deliver the policy. *See e.g. Louisiana Maintenance Services, Inc.*, 616 So. 2d at 1252-53; *Straughter v. Hodnett*, 42, 827 (La. App. 2 Cir. 2008); 975 So. 2d 81,88. (Doc 13-1 at 9.)

In response to Plaintiff's allegation that the contract is an absolute nullity because Phoenix failed to comply with the policy *Application*, Defendant argues that Louisiana law does not require personal or physical delivery of a policy unless the application or policy expressly states such a requirement. Citing a string of cases, Defendant argues that neither the *Application* nor the Policy expressly state that the policy requires "actual delivery" and Plaintiff fails to allege that the Policy was never "constructively delivered" to him by mail or by delivery to his agent. (Doc. 13-1 at 9.) Plaintiff only argues that he never received the Policy personally. (*Id.*)

### b. Plaintiff's Opposition to Defendant's Motion to Dismiss (Doc. 18)

Plaintiff argues that a violation of La. Rev. Stat. § 22:873 (requiring that every policy of insurance should be delivered to the insured within a reasonable time) results in an absolute nullity because the statute requiring delivery is intended to protect a large class of persons, namely all purchasers of insurance. (Doc. 18 at 5.) Plaintiff also alleges that the undelivered policy is an absolute nullity because it fails to comply with the *Application* which states that the "policy and insurance applied for will take effect when the policy is delivered to the owner and the full first premium is paid. . ." Ex. A-2. (Doc. 11-1 at 11.)

### 2. Relevant Standard

At issue is whether an undelivered life insurance policy results in an absolute nullity under La. Civ. Code art. 2030, which provides that "[a] contract is absolutely null when it violates a rule of public order…" Louisiana Revised Statute 22:873(A) states, "[s]ubject to the insurer's requirements as to payment of premium, every policy shall be delivered to the insured or to the person entitled thereto within a reasonable period of time after its issuance. . ." La. Rev. Stat. §

22:873(a).  The Louisiana Supreme Court's decision in *Louisiana Maintenance Services* describes the consequences of a party's failure to comply with La. Rev. Stat. § 22:873. *Louisiana Maint. Servs., Inc. v. Certain Underwriters at Lloyd's of London*, 616 So.2d 1250 (La.1993). The court in *Louisiana Maint. Serv.* held that while an undelivered insurance policy is enforceable, an insurance company cannot enforce the policy exclusions of the undelivered policy. (*Id.*) The Fifth Circuit in *Settoon Towing,* relying on *Louisiana Maintenance Services*, held that the "delayed delivery [of the policy] in violation of La. Rev. Stat. § 22:873(A) is enough to prevent SNIC from relying on the pollution exclusions. . ."  *In re Matter of the Complaint of Settoon Towing, L.L.C,* 720 F. 3d 268, 282 (5th Cir. 2013). Further, the Louisiana Second Circuit Court of Appeal stated, in pertinent part:

> We recognize the rule that insurance policy exclusions are not valid unless they are clearly communicated to the insured. ***Notice of any exclusionary provisions is essential because the insured will otherwise assume the desired coverage exists***. *Louisiana Maintenance Services, Inc. v. Certain Underwriters at Lloyd's of London*, 616 So.2d 1250 (La.1993); *Sims v. Insurance Unlimited of West Monroe*, 28,234 (La.App.2d Cir.2), 669 So.2d 709, writ denied, 96–0785 (La.5/3/96), 672 So.2d 689. If an insurer fails to comply with the statutory requirement of delivery, it cannot rely on its policy exclusions. *Naquin v. Fortson*, 1999–2984 (La. App. 1st Cir.12/22/00), 774 So.2d 1277.

*Straughter v. Hodnett*, 42,827 (La. App. 2 Cir. 1/9/08); 975 So.2d 81, 87–88 (emphasis added).

Further, in *Shermohmad v. Ebrahimi*, the plaintiff appealed to the appellate court arguing that the trial court erred in ruling that the plaintiff had no cause of action for nullification of her insurance policies. *Shermohmad v. Ebrahimi*, 945 So.2d 119, 123 (La. App. 5 Cir. 10/31/06). The Louisiana Fifth Circuit Court of Appeal found no error of the trial court in its ruling dismissing a plaintiff's claim of nullification on the basis that the record indicated at the time the suit was filed that most of the policies had lapsed. *Id*. Further the court reasoned that "the evidence . . . indicate[d] that plaintiff continued to pay premiums on the policies after discovering the alleged wrongful

acts, thus confirming any relative nullity in the contracts" under La. Civ. Code art. 2031.[3] *Id.* at 122–23.

### 3. Analysis

Plaintiff fails to state a claim upon which relief can be granted in his claim that the undelivered policy is an absolute nullity. Under La. Civ. Code art. 2030, a contract is an "absolute nullity when it violates a rule of public order, as when the object of a contract is illicit or immoral." When a contract is absolutely null, the court will treat the contract as if it never existed. But Louisiana jurisprudence suggests that a violation of La. R.S. § 22:873 does not "violate[] a rule of public order," as Louisiana courts routinely treat undelivered polices as valid and enforceable (even if such courts do not enforce policy exclusions due to a lack of notice). *See Louisiana Maintenance Service; Straughter;* & *Settoon*, *supra*.

Plaintiff states in the Amended Complaint that instead of providing permanent insurance to the Plaintiff, Phoenix "charged 'mortality charges' that caused the investment fund to be reduced to zero, the policy to become unaffordable, ***the policy to lapse***, the death benefit to expire. . ." (Doc. 8 at 12) (emphasis added). Plaintiff here concedes that the policy has lapsed. Following the rationale of the court in *Shermohmad*, because the policy has lapsed, Plaintiff can no longer claim that the policy is null, as the policy itself is no longer in existence.

Plaintiff also claims that the Policy is null on the basis that Phoenix failed to comply with

---

[3] Article 2031 provides:

> A contract is relatively null when it violates a rule intended for the protection of private parties, as when a party lacked capacity or did not give free consent at the time the contract was made. A contract that is only relatively null may be confirmed.

> Relative nullity may be invoked only by those persons for whose interest the ground for nullity was established, and may not be declared by the court on its own initiative.

La. Civ. Code Ann. art. 2031.

the *Application for Insurance*[4] (Doc. 8 at 11), which states, "[t]his policy will not take effect unless the Initial Premium has been paid and the policy has been delivered to you . . ." (Doc. 5-4 at 3). In Louisiana, actual or physical delivery is not necessary to effectuate the contract of insurance if the contract is otherwise completed. *New Jersey Life Ins. Co v. Henri Petetin Inc.*, 55247 (La. 1975) (citing *Coci v. New York Life Ins. Co.,* 155 La. 1060 (La. 1924)). For example, in *John v. Gourmet Pizzas*, *Inc.*, 00–0749 (La .App. 4 Cir. 1/31/01), 778 So.2d 1223, the First Circuit Court of Appeal had to decide whether an agent of the insured was a person entitled to delivery of the policy. To answer that question, the *Gourmet Pizzas* court relied upon the Supreme Court's decision in *Pruitt v. Great Southern Life Ins. Co.,* 12 So.2d 261, 262 (La.1942) which stated:

> A delivery of an insurance policy **may be actual or constructive**. Actual delivery is not essential, unless expressly made so by the terms of the agreement. Whether an insurance policy has or has not been delivered after its issuance so as to complete the contract and give it binding effect does not depend upon its manual delivery to, or possession by, insured, but rather upon the intention of the parties as manifested by their acts or words. The test of a sufficient delivery is whether the company or its agent intentionally parts with control or dominion of the policy and places it in

---

[4] Here, the Court notes that it is relying on some material in the record as well as, for the reasons further delineated below, exhibits attached to the Defendant's motion to dismiss (Doc. 13). This requires a brief explanation.

In general, pursuant to Rule 12(d), "[i]f, on a motion under Rule 12(b)(6)[,] … matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ P. 12(d); *United States v. Rogers Cartage Co.,* 794 F.3d 854, 861 (7th Cir. 2015). There are some exceptions to this standard. On a motion to dismiss, the court may consider "the complaint, its proper attachments, 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross and Blue Shield of Georgia, Inc.,* No. 14-11300, 2018 WL 2943339, at *3 (5th Cir. June 12, 2018) (citing *Wolcott v. Sebelius,* 635 F.3d 757, 763 (5th Cir. 2011) (quoting *Dorsey,* 540 F.3d at 338) (citations and internal quotations marks omitted) ). As the Fifth Circuit has explained, "[i]f the district court does not rely on materials in the record, such as affidavits, it need not convert a motion to dismiss into one for summary judgment." *U.S. ex rel. Long v. GSDMIdea City, L.L.C.,* 798 F.3d 265, 275 (5th Cir. 2015) (citing *Davis v. Bayless,* 70 F.3d 367, 372 n.3 (5th Cir. 1995) ). "[T]he mere submission [or service] of extraneous materials does not by itself convert a Rule 12(b)(6) [or 12(c) ] motion into a motion for summary judgment." *Id.* (quoting *Finley Lines Joint Protective Bd. v. Norfolk S. Corp.,* 109 F.3d 993, 996 (4th Cir. 1997) (internal quotation marks omitted) (second alteration in original) ). A district court, moreover, enjoys broad discretion in deciding whether to treat a motion to dismiss as a motion for summary judgment. *See St. Paul Ins. Co. v. AFIA Worldwide Ins. Co.*, 937 F.2d 274, 280 n.6 (5th Cir. 1991).The Fifth Circuit has recognized a limited exception to the general rules under Federal Rule of Civil Procedure 12(d) and related jurisprudence. The Fifth Circuit has approved district courts' consideration of documents attached to a motion to dismiss, when such documents are referred to in the plaintiff's complaint and are central to the plaintiff's claim. *See Werner v. Dept. of Homeland Sec.*, 441 Fed.Appx. 246, 248 (5th Cir. 2011); *Scanlan v. Texas A & M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003); *Collins*, 224 F.3d at 498-99.

Thus, while the Court does consider documents outside of the Plaintiff's Complaint, these documents are referenced in and central to the Plaintiff's Complaint. Thus, the Court may consider these exhibits in order to decide the present motion without converting it to a motion for summary judgment.

the control or dominion of the insured or some person acting for him with the purpose of thereby making a valid and binding contract of insurance.

*Id.* (emphasis added). Thus, in Louisiana, personal delivery is not required to effectuate delivery of the policy unless the application or policy expressly states such a requirement. *Pruitt v. Great Southern Life Ins. Co.*, *supra*.

Here, while the *Application* states that the "policy will not take effect until the policy has been delivered to you," Plaintiff does not allege that the Policy was not mailed to him or to his agent, which would constitute constructive delivery, a valid form of delivery in Louisiana. He only alleges that the Policy was not delivered to him personally. Moreover, even if the policy was never actually or constructively delivered as required by the *Application*, the policy would not be null because Plaintiff continued to pay the premium on the policy for 30 years, evidencing Plaintiff's intent that the policy be in effect. *See Oil Well Supply Co. v. New York Life Ins. Co.*, 214 La. 772, 38 So.2d 777 (1949) ("Where intent of parties is evident in terms of the policy, there is nothing for court to construe, and the policy must be given a reasonable interpretation consonant with apparent objects and plain intents of the parties"), ("Generally, where a policy is antedated at request of insured, agreement is binding on both insurer and insured, and premium periods begin on date so inserted, though the policy is not delivered until a later date."), ("An applicant has the choice of paying the first premium at the time he submits the application, in which event, if the application be approved, the insurance becomes effective from that date; so that if the applicant were to die before the policy is actually delivered, the beneficiary would nevertheless receive the full amount of the policy.").

Therefore, failure to comply with the application for insurance cannot result in an absolute nullity, as courts routinely enforce policies that do not comply with the application if the parties' actions show that they intended for the policy to be in effect. For this and the above reasons,

Plaintiff's claim for an absolute nullity must be dismissed.

### E. Prescription and Plaintiff's Claim for Error or Fraud

#### 1. Parties' Arguments

##### a. Defendant's Arguments in Support of its Motion to Dismiss (Doc. 13-1)

Next, Defendant argues that, since Plaintiff was advised in February 2009 that annual premiums of $1,200 would not sustain the Policy in the future yet did not bring the current suit until nine years later, his claim that error or fraud vitiated consent has prescribed and should be dismissed. In further support of this argument, Defendant asserts that based on the *ILLUSTRATION* provided to Plaintiff in 1986, he knew that the Policy's premiums and costs could vary based on changing interest rates and costs of insurance, which in turn could cause the Policy to lapse by year 19. (Doc 13-1 at 11.)

##### b. Plaintiff's Opposition to Defendant's Motion to Dismiss (Doc. 18)

In response to Defendant's Motion to Dismiss the Plaintiff argues pursuant to La. Civ. Code art. 2032 cmt. (b) that prescription has not run because Phoenix delayed discovery of the fraud or error for over 30 years by not disclosing that additional premiums would deplete the investment fund making the Policy "uneconomic". (Doc. 18 at 6.) Phoenix's letter in February of 2009 stated, "It is important for you to remember that your policy is a premium paying contract and has reached a point where it requires more than $100 monthly to support the death benefit." Ex. A-1. (Doc. 18 at 8.) Plaintiff argues that, because the 2009 letter does not inform him as to how much the rate will increase, the letter does not suffice as "discovery" for the purposes of La. Civ. Code art. 2032. (*Id.*) Plaintiff argues that the fraud/error referenced in his Amended Complaint concerns Phoenix's failure to disclose for 30 years that the investment fund was a false promise.

(Doc. 18 at 7.)

### c. Defendant's Reply in Support of its Motion to Dismiss (Doc. 20)

Plaintiff argues that the real issue is that he was not told in 1986 what his required premiums would be 30 years later, thereby delaying discovery of the error/fraud. In response, Defendant states that this allegation by Plaintiff is impossible as he purchased a life insurance policy whose performance could vary based on how he elected to fund it. Further, Defendant asserts that Plaintiff's argument that he did not discover the error/fraud in 1986 is erroneous as the *ILLUSTRATION* given to him on that day stated that actual performance could vary and that the Policy could lapse in year 19. (Doc. 20 at 4-5.)

Additionally, Plaintiff asserts that his claim is not that $1,200/year in premiums would sustain the Policy, but rather that the investment fund would sustain the Policy. Defendant points out that this is "without a difference." (Doc. 20 at 5.) Defendant asserts that Plaintiff knew, as evidenced by the February 2009 letter, that, regardless of the investment fund, the Policy required more premiums. (Doc. 20 at 5.)

Lastly in response to Plaintiff's argument that the February 2009 letter guaranteed him coverage for life because it said "Universal Life (UL)… provides coverage for the insured's entire life," Defendant argues that Plaintiff "cherry picks" words from the letter and ignores the next paragraph that explained to him that the Policy permitted flexible premiums where, when interest rates are low, "an increase in premium payment may be necessary to sustain insurance coverage." (Doc. 20 at 5.) Further, the letter stated that the premium payment contract had reached a point where it required more than $100 monthly to support the death benefit. Therefore, Defendant argues, the Policy does provide coverage for Plaintiff's entire life as long as he pays for it. (Doc. 20 at 5.)

## 2. Relevant Standard

A party's consent to a contract may be vitiated by error, fraud, or duress. La. Civ. Code art. 1948. As to error, under Article 1949, "error vitiates consent only when it concerns a cause without which the obligation would not have been incurred and that cause was known or should have been known to the other party." La. Civ. Code art. 1949. On the other hand, fraud "is the misrepresentation or suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other..." La. Civ. Code art. 1953. Essential to the survival of Plaintiff's claim of fraud and error is Article 2032 which states that an "action of annulment of a relatively null contract must be brought within five years from the time the ground for nullity either ceased, as in the case of incapacity or duress, or was discovered, as in the case of error or fraud." La. Civ. Code art. 2032.

## 3. Analysis

Plaintiff fails to state a claim upon which relief can be granted because his claims of fraud and/or error have prescribed. If fraud or error existed, the prescriptive period began to run on the day the *ILLUSTRATION* was given to Plaintiff, which was the day of sale in December 1986. He claims he believed in error that he was receiving permanent insurance that could be sustained by paying $100/month premium without additional deductions, but he should have been put on notice of this error at the time of sale since the *ILLUSTRATION*[5] clearly stated that the premium was subject to change in year 19. Therefore, prescription would have accrued in 1991 (5 years from "discovery"), making Plaintiff's 2018 claim time-barred.

Further, even if the claims had not prescribed, Plaintiff would not be able to prevail on error. The Policy itself explained that the premiums paid would be placed in the investment fund

---

[5] *Supra* fn. 3.

from which monthly deductions for the "cost of insurance" and other expenses would be taken. Further, nowhere does the Policy guarantee that premiums of $1,200/year or $100/month will keep the Policy in force permanently. (Doc. 5-4 at 4.) The Policy does not misrepresent the terms agreed upon. *Reaux v. Moresi*, 120 So.3d 959, 962 (La. App. 3 Cir. 8/28/13) ("[a]n insured is responsible for reading its policy and is presumed to know its contents." (citing *Piligra v. Am.'s Best Value Inn*, 49 So.3d 479 (La. App. 3 Cir. 10/6/10)).

The same reasoning applies to the claim of fraud as it relates to prescription. If Defendant was trying to defraud Plaintiff by misrepresenting the terms in the Policy, Plaintiff should have discovered the alleged fraud on the day of sale since the *ILLUSTRATION* stated that the premiums and interest were subject to change. Further, even if the claim of fraud had not prescribed, Plaintiff fails to allege that Phoenix's agent sold the Policy to him with the intent to deceive *See Boudreaux v. Jeff,* 884 So.2d 665, 672 (La. App. 1 Cir. 9/17/04) (intent to defraud and loss or damage are two essential elements to constitute legal fraud). Additionally, La. Rev. Stat. § 22:860 states:

> A. Except as provided in Subsection B of this Section, R.S. 22:1314, and 1315, no oral or written misrepresentation or warranty made in the negotiation of an insurance contract, by the insured or in his behalf, shall be deemed material or defeat or void the contract or prevent it attaching, unless the misrepresentation or warranty is made with the intent to deceive…

Lastly, if the *ILLUSTRATION* and the Policy itself is not enough to have put Plaintiff on notice of the alleged fraud and error, then Phoenix's letter in February of 2009 should have. The letter states, "It is important for you to remember that your policy is a premium paying contract and has reached a point where it required more than $100.00 monthly to support the death benefit. UL policies are flexible premium policies (not level premium like Whole life) and depend on prevailing interest rates to keep the accumulation account large enough to support the death benefit." (Doc. 5-3 at 2.)

In sum, the letter provided Plaintiff with adequate notice of the alleged fraud/error. Discovery would have thus been in 2009, in which case prescription would have accrued in 2014. Because Plaintiff did not file suit until 2018, his claims for fraud/error have prescribed.

## IV.    Discussion of *Plaintiff's Motion to Defer Prescription to Trial*. (Doc. 21.)

### A.  Relevant Facts

Aside from the Defendant's motion to dismiss discussed above, Plaintiff seeks to defer the issue of prescription of the contractual fraud and error claims to trial on the merits. (Doc. 21 at 1.) Plaintiff makes this demand based on documents not provided to the Court with the Amended Complaint, assertions about how he would testify at trial, and conjecture about documents he might obtain in discovery. Plaintiff argues that there is an issue of fact as to whether his error/fraud claim has prescribed and that, therefore, the determination regarding prescription should be deferred to trial. (Doc. 21 at 2.)  In response, Defendant filed an opposition. (Doc. 23.) Subsequently, Plaintiff filed a Motion to Strike the Motion to Delay Ruling on Prescription and a Motion to Withdraw the Motion to Delay Ruling on Prescription. (Doc. 29.)

### B.  Parties' Arguments

#### 1.  Plaintiff's Arguments

Plaintiff claims that prescription was delayed due to Phoenix's concealment of the fraud/error and therefore prescription has not accrued. He alleges that Phoenix has produced documents that support his claim of concealment. (*Id*.)  Plaintiff concedes that these documents are not all included in the Amended Complaint; therefore, the Plaintiff requests an opportunity to present the documents in opposition to the prescription claim, preferably at trial on the merits. (Doc. 21 at 1.) In addition, Plaintiff states he expects that he will be able to produce sufficient evidence and testimony at trial to prove concealment of the fraud and error. (Doc 21 at 2.) In

conclusion, he requests an opportunity to obtain and present all relevant documents at trial to oppose Phoenix's argument that the claims for contractual fraud and error have prescribed under La. Civ. Code art. 2032. (Doc. 21 at 6.)

### 2. Defendant's Opposition

Defendant asserts that Plaintiff's motion is nothing more than a "sur-reply" on the now closed motion to dismiss. (Doc. 23 at 1.) Defendant argues that the purpose of a 12(b)(6) Motion to Dismiss is to test the pleadings to determine whether Plaintiff has sufficiently alleged a claim in which, if so, the claim can survive the motion to dismiss. Further, Defendant argues that Plaintiff's claim of fraud/error will not survive the 12(b)(6) Motion to Dismiss due to prescription, but if it did happen to survive, then he can put forth evidence to support this claim. Essentially, Defendant argues that Plaintiff cannot circumvent the Motion to Dismiss simply because he allegedly has evidence that will show an issue of fact exists. Accordingly, Defendant argues that the motion is improper, unsupported, premature, and should be denied. (*Id.*)

### C. Relevant Standard

A fundamental and well settled principle is that "a plaintiff who fails to state a claim is not entitled to further discovery." *Hall v. U.S. Bank, N.A.*, 626 F. App'x 114, 116 (6th Cir. 2015) (citing *Mitchell v. McNeil*, 487 F.3d 374, 379 (6th Cir. 2007)). Further, "when plaintiffs file a complaint that fails to state a claim as a matter of law, they cannot be heard to complain about not being provided additional discovery. In the absence of a cognizable claim, they have no right to discovery…" *Mitchell,* 487 F.3d at 379. Similarly, in *Hall,* the Sixth Circuit agreed that the plaintiff was not entitled to Rule 56(d) discovery in response to a Rule 12(b)(6) motion.

### D. Analysis

The principles articulated in the above standard apply here; Plaintiff cannot obtain

discovery if he fails to state a claim for relief. Essentially, Plaintiff cannot circumvent the application of Rule 12(b)(6) by claiming a need for discovery. Plaintiff "overlooks a fundamental and well settled principle: a plaintiff who fails to state a claim is not entitled to further discovery." *Hall*, 626 F. App'x at 116 (citing *Mitchell*, 487 F.3d at 379). Additionally, he fails to explain what facts would overcome the showing that he had notice in 2009 of the alleged fraud/error, thereby commencing the running of prescription. For all of these reasons, Plaintiff's motion to defer ruling will be denied.

### E. Leave to Amend

"[A] court ordinarily should not dismiss the complaint except after affording every opportunity to the plaintiff to state a claim upon which relief might be granted." *Byrd v. Bates*, 220 F.2d 480, 482 (5th Cir. 1955). The Fifth Circuit has further stated:

> In view of the consequences of dismissal on the complaint alone, and the pull to decide cases on the merits rather than on the sufficiency of pleadings, district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal.

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002). Relying on *Great Plains* and other cases from this circuit, one district court in Texas articulated the standard as follows:

> When a complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend before dismissing the action with prejudice unless it is clear that the defects in the complaint are incurable. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002); *see also United States ex rel. Adrian v. Regents of the Univ. of Cal.*, 363 F.3d 398, 403 (5th Cir. 2004) ("Leave to amend should be freely given, and outright refusal to grant leave to amend without a justification . . . is considered an abuse of discretion.") (internal citation omitted). However, a court may deny leave to amend a complaint if the court determines that "the proposed change clearly is frivolous or advances a claim or defense that is legally insufficient on its face." 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1487 (2d ed.1990)

(footnote omitted); *see also Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States of Am. Co.*, 195 F.3d 765, 771 (5th Cir. 1999) ("A district court acts within its discretion when dismissing a motion to amend that is frivolous or futile.") (footnote omitted).

*Tow v. Amegy Bank N.A.*, 498 B.R. 757, 765 (S.D. Tex. 2013). Finally, one leading treatise

explained:

> As the numerous case[s] . . . make clear, dismissal under Rule 12(b)(6) generally is not immediately final or on the merits because the district court normally will give the plaintiff leave to file an amended complaint to see if the shortcomings of the original document can be corrected. The federal rule policy of deciding cases on the basis of the substantive rights involved rather than on technicalities requires that the plaintiff be given every opportunity to cure a formal defect in the pleading. This is true even when the district judge doubts that the plaintiff will be able to overcome the shortcomings in the initial pleading. Thus, the cases make it clear that leave to amend the complaint should be refused only if it appears to a certainty that the plaintiff cannot state a claim. A district court's refusal to allow leave to amend is reviewed for abuse of discretion by the court of appeals. A wise judicial practice (and one that is commonly followed) would be to allow at least one amendment regardless of how unpromising the initial pleading appears because except in unusual circumstances it is unlikely that the district court will be able to determine conclusively on the face of a defective pleading whether the plaintiff actually can state a claim for relief.

5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2016).

Here, though Plaintiff makes no specific request to amend his Petition if there are

deficiencies, the Court will act in accordance with the "wise judicial practice" and general rule and

allow leave to amend.

## V.     Conclusion

Accordingly,

**IT IS ORDERED** that *Defendant's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)*

(Doc. 13) filed by Defendant Phoenix Life Insurance Company is **GRANTED**, and all of

Plaintiff's claims are **DISMISSED**. Plaintiff is given twenty-eight (28) days in which to amend

his complaint to cure the deficiencies therein. If Plaintiff fails to do so, the insufficient claims will be dismissed with prejudice.

**IT IS FURTHER ORDERED** that *Plaintiff's Motion to Defer Prescription to Trial*. (Doc. 21) is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>March 4, 2019</u>.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**